**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **RAVEN HENDERSON, M.D.** | ) | |
| | ) | CIVIL ACTION |
| **Plaintiff**, | ) | |
| | ) | Case No.: |
| v. | ) | |
| | ) | |
| | ) | |
| **STORMONT-VAIL** | ) | |
| **HEALTHCARE, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff Raven Henderson, M.D., by and through undersigned counsel, for her Complaint, hereby states and alleges:

## PARTIES

1.      Plaintiff Raven Henderson, M.D. ("Plaintiff") resides in Lawrence, Kansas.

2.      Defendant Stormont-Vail Healthcare, Inc. ("Defendant") is a Kansas not-for-profit corporation licensed to do business in Kansas and that regularly transacts business in Kansas, and Defendant may be served with process via its Resident Agent, Cynthia Wickstrom, at 1500 SW 10th Ave., Topeka, Kansas 66604.

3.      Defendant is a corporation and can act only through its officers and employees, and the conduct of an officer or employee acting within the scope of his employment or authority is the conduct of the corporation.

## NATURE OF ACTION

4.      Plaintiff is a physician formerly employed by Defendant. This is an action for employment discrimination brought to secure legal and equitable relief for injuries sustained by Plaintiff as a result of Defendant's discrimination against her on the basis of her race, in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §2000e, *et seq.* ("Title VII") and the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Section 1981").

5.      Defendant violated Title VII and Section 1981 by unlawfully retaliating against Plaintiff for exercising her rights under Title VII and Section 1981, as set forth below.

6.      Plaintiff seeks injunctive and declaratory relief, compensatory damages, punitive damages, and reasonable attorneys' fees and costs as remedies for Defendant's violation of her rights.

## JURISDICTION AND VENUE

7.      This Court has primary jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331, as this case involves questions of federal law.

8.      This Court is a proper venue under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because Defendant is subject to this Court's personal jurisdiction by maintaining facilities and business operations in this District, and because the events and unlawful employment practices that form the basis for this action occurred in this District.

9.      Venue is proper on Plaintiff's Section 1981 claims because Defendant resides in, and transacts business in, this District, and because the unlawful employment practices alleged herein occurred in this District.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

10.     As a result of the unlawful employment practices alleged herein, on February 18, 2020, Plaintiff dually filed a Charge of Discrimination with the Kansas Human Rights Commission and the Equal Employment Opportunity Commission ("EEOC"), which is attached hereto as Exhibit A.

11.     Plaintiff's Charge culminated into a "Notice of Right to Sue" letter issued by the EEOC on February 3, 2021, which is attached hereto as Exhibit B.

12.     Plaintiff is filing this suit within 90 days of Plaintiff's receipt of the Notice of Right to Sue letter and this suit is timely filed.

13.     Plaintiff exhausted all administrative remedies prior to filing this suit.

14.     When relevant, Defendant's conduct herein constituted a continuing violation of Plaintiff's federally protected rights stated herein.

**FACTUAL BACKGROUND**

15.     Plaintiff was hired by Defendant as a physician in July 2017. Per the written employment agreement entered into by the parties, Plaintiff's employment began on October 1, 2017.

16.     Throughout her employment with Defendant, Plaintiff practiced as a Plastic Surgeon at Defendant's facility, Stormont-Vail Health Care, located at 1500 SW 10th Avenue, Topeka, Kansas 66604.

17.     Plaintiff's race is African-American.

18.     Plaintiff's color is dark-skin toned.

19.     Throughout Plaintiff's employment, the other Plastic Surgeons working at Defendant's facility were Caucasian, and they had much lighter skin tones than Plaintiff.

20.     At all times relevant to this Complaint, Plaintiff was treated less favorably by Defendant than her similarly situated, lighter-skinned, Caucasian counterparts; Plaintiff was subjected to discrimination based on her race and color, including, but not limited to, the incidents cited herein.

21.     At all times relevant to this Complaint, Plaintiff was subjected to a racially motivated hostile work environment.

22.     Throughout Plaintiff's employment, all of the other Plastic Surgeons worked on the facility's 2nd floor.  Although Plaintiff desired to work on the 2nd floor, at the time of her hire, Defendant advised her that there was no room for her to have an office on the 2nd floor. As a result, Plaintiff was assigned to work on the 3rd floor, which was comprised of General Surgeons.

23.     In October 2018, Plaintiff requested that her employment agreement be amended so that she could expand her practice to perform additional procedures that she was licensed to perform.  Defendant denied her request; however, Plaintiff is aware of at least one Caucasian physician employed by Defendant who was granted the same type of request.

24.     In November 2018, Defendant hired another Caucasian Plastic Surgeon, and she worked in an office on the 2nd floor along with the other Caucasian Plastic Surgeons.

25.     On several occasions during Plaintiff's employment, 2nd floor staff—who regularly assisted Plastic Surgeons—refused to assist 3rd floor staff.

26.     On one occasion, a Caucasian employee of Defendant used the "n-word" directly to one of Plaintiff's African-American staff members.

27.     Defendant's Registrar, a Caucasian female, was responsible for taking phone calls from plastic surgery patients seeking an appointment with a physician. During Plaintiff's employment, the Registrar regularly referred these patients to Caucasian Plastic Surgeons instead of Plaintiff.

28.     In January 2019, Plaintiff made a complaint of race discrimination, citing the above incidents, to four individuals within Defendant's organization: Plaintiff's Surgical Liason, Director of Clinic, the Chief Medical Officer, and the Chief Executive Officer.

29.     From January through March 2019, Plaintiff was a participant in Defendant's purported investigation of her discrimination complaint.

30.     Beginning in March 2019 through September 4, 2019, Plaintiff was subject to further disparate treatment by Defendant.  Plaintiff's work was closely scrutinized, including a review of 15 of her patient cases. Additionally, Defendant refused to assign any plastic surgery nurses to Plaintiff—only general surgery staff. As a result, Plaintiff was forced to train general surgery staff on procedures that were specific to the plastic surgery specialty, which consumed a considerable amount of time.

31.     In late April or early May 2019, Defendant closed its purported investigation of Plaintiff's discrimination complaint.

32.     On or about August 1, 2019, a Caucasian nurse—who had never before assisted with a surgery—made an adverse report to Defendant about Plaintiff's surgical technique during surgery.

33.     Defendant opened a "case" over the alleged incident, which was subject to a peer review process by Defendant's Medical Staff Peer Review.

34.     In August 2019, Plaintiff requested a job transfer, which Defendant denied.

35.     Plaintiff provides physician services for the organization Doctors Without Borders. In August 2019, Plaintiff notified Defendant that she would be departing on a mission trip for the organization.

36.     On August 24, 2019, after a letter from Defendant was delivered to Plaintiff's home address, Plaintiff emailed Defendant a request that it notify her via phone or email if she should be expecting any work-related documents at her home address and especially any documents that would require a timed response. Plaintiff reiterated this request in other emails regarding upcoming peer review meetings; however, Defendant did not heed Plaintiff's request.

37.     On or about August 30, 2019, Defendant reported the nurse's allegation to the Kansas Department of Healing Arts, the entity responsible for licensing Kansas physicians.

38.     On or about September 4, 2019, Plaintiff's employment with Defendant was terminated.

39.     Although the parties' employment agreement required Defendant to provide Plaintiff with a 90-day notice of a termination, Defendant did not do so. Plaintiff's termination was effective immediately; she was not allowed to perform any work during the 90 days subsequent to the termination notice.

40.     On or about November 12, 2019, Plaintiff notified Defendant that she would be traveling and would only be able to receive documents through email.

41.     On November 14, 2019, after learning that Defendant's Quality Improvement Committee had made an adverse "Standard of Care" finding against her during its October 8th meeting, Plaintiff expressed her intention to appeal the finding. The appeal mechanism provided by Defendant was an upcoming, in-person meeting.  Plaintiff's advised, however, that she would not return to the area until at least January 4th, 2020, and she asked to participate in the meeting via videoconferencing.

42.     When Plaintiff returned home from her mission trip on or about January 13, 2020, she retrieved various letters from the U.S. Post Office that Defendant had mailed to her home address, despite knowing of her extended absence. The letters included time-sensitive response deadlines.  Two letters from November and December 2020 informed Plaintiff of her right to appeal the QIC's adverse finding and that her only means of doing so would be to attend a January 14th QIC meeting.

43.     Also on January 13, 2020, Plaintiff sent an email notifying Defendant that she had just returned from her travels, had just received the notification letter about the January 14th meeting, and advised that she was not prepared to attend the QIC meeting the next day. Plaintiff instead proposed that she attend the QIC's February meeting for purposes of the appeal. Plaintiff also reiterated her prior requests that Defendant communicate by email any time-sensitive documents.

44.     On January 16, 2020, Defendant again sent a certified letter to Plaintiff's home address, notifying her that the QIC's adverse Standard of Care finding had been referred to another internal committee, the Medical Executive Committee.

45.      Plaintiff was prepared to attend the new committee's April 10th meeting; however, in late March, Defendant notified Plaintiff that the meeting was cancelled due to the COVID-19 pandemic.

46.      After some communications exchanged between the parties, the new committee's meeting was scheduled for May 8, 2020, at which time Plaintiff was initially unavailable. Plaintiff changed her plans and arrived for the meeting, but it had been cancelled.

47.      Ultimately, the Medical Executive Committee meeting was held on June 12, 2020, Plaintiff attended, and Defendant's committee upheld the adverse finding.

48.      In March 2021, the Kansas Board of Healing Arts issued its finding that no Standard of Care violation occurred in August 2020.

**COUNT I - Race and Color Discrimination in Violation of Section 1981**

49.      Plaintiff hereby incorporates by reference the above paragraphs of this Complaint as though fully set forth herein.

50.      Plaintiff had an employment contract with Defendant which is subject to the provisions of Section 1981.

51.      Defendant engaged in discriminatory practices with regard to the terms and conditions of Plaintiff's employment on the basis of her race, African-American, and her color, dark-skin toned.

52.      As a result of Defendant's illegal conduct, Plaintiff has suffered economic damages, including lost compensation, and non-economic damages in the form of pain and suffering, including humiliation, embarrassment, inconvenience, and mental and emotional distress.

### COUNT II – Race and Color Discrimination in Violation of Title VII

53.      Plaintiff hereby incorporates by reference the above paragraphs of this Complaint as though fully set forth herein.

54.      Plaintiff is an individual protected by the provisions of Title VII.

55.      At all relevant times, Plaintiff was subject to discriminatory treatment during the course of her employment by Defendant, including Defendant's agents, on the basis of her race, African-American, and her color, dark-skin toned.

56.      Due to Plaintiff's complaints to Defendant of discriminatory treatment, Defendant knew or had reason to know of the race and color discrimination stated herein and failed to take prompt and effective action to remedy the situation.

57.      Plaintiff suffered adverse employment actions, including denial of a transfer and discharge.

58.      Defendant discriminated against Plaintiff with respect to the compensation, terms, conditions and privileges of Plaintiff's employment because of Plaintiff's race and color.

59.      Plaintiff has been damaged by Defendant's illegal conduct in that she has suffered economic damages and emotional distress.

### COUNT III - Race Discrimination (Racial Harassment –Hostile Work Environment) in Violation of Section 1981 and Title VII

60.      Plaintiff restates and re-alleges the above paragraphs as if fully set forth in this cause of action.

61.      At all relevant times, Plaintiff worked in an environment that allowed racial slurs, where racial animus against African-Americans was acceptable, and where Plaintiff was discriminated against based on her race; Plaintiff's work environment was permeated with

discriminatory intimidation that was so severe and pervasive that a reasonable person would consider it intimidating, hostile, and/or abusive.

62.     Plaintiff suffered a continuing pattern of severe and pervasive conduct that directly affected Plaintiff, interfered with her work performance, altered the conditions of Plaintiff's employment, and created an intimidating and offensive work environment.

63.     The harassment suffered by Plaintiff stemmed from racial animus and rose to the level of racial harassment.

64.     Defendant's top officials were aware, or at the least should have known, of the racial harassment as Plaintiff provided information sufficient to raise a probability of racial harassment in the mind of a reasonable employer.

65.     Yet, Defendant failed to take reasonable steps to prevent and/or promptly correct the harassing behavior, and instead allowed a company-wide practice of discrimination in the workplace.

66.     Plaintiff took reasonable advantage of the preventive and corrective opportunities available to cease the racial harassment.

67.     As a direct, legal, and proximate result of this harassment, Plaintiff has sustained, and will continue to sustain, economic and emotional damages in an amount to be determined at trial.

68.     Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard for Plaintiff's right to be free from racial harassment that creates an intimidating, offensive, and hostile work environment.

69.     Plaintiff is entitled to her reasonable attorneys' fees and costs of suit.

## COUNT IV – Retaliation in Violation of Title VII and Section 1981

70.     Plaintiff hereby incorporates by reference the above paragraphs of this Complaint as though fully set forth herein.

71.     Plaintiff complained to Defendant of racially discriminatory treatment and participated in an employment discrimination investigation, both of which are protected activities under Title VII and Section 1981.

72.     Subsequent to Plaintiff's engagement in protected activity, Defendant took materially adverse actions against Plaintiff, to include denial of a transfer, discharge, and post-discharge actions, as alleged herein.

73.     As a direct result of Plaintiff's opposition to Defendant's racially discriminatory treatment, Plaintiff suffered an adverse employment action, her discharge from employment, as well as subsequent materially adverse actions.

74.     Plaintiff has been damaged by Defendant's illegal conduct in that she has suffered economic damages and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Raven Henderson, M.D. demands judgment against Defendant Stormont-Vail Healthcare, Inc. and requests the following relief from this Court:

1.     For her economic damages, including but not limited to, back pay and lost fringe benefits, in an amount that is fair, reasonable, and sufficient to compensate Plaintiff for the economic losses she sustained;

2.     For compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

3.      For punitive damages in an amount to be determined at trial;

4.      Pre-judgment and post-judgment interest, as provided by law;

5.      For an order enjoining Defendant from engaging in the unlawful acts complained of herein;

6.      For reasonable attorneys' fees and costs of this lawsuit pursuant to 42 U.S.C. § 2000e-5(k), Section 1981, and other applicable laws; and

7.      For other such and further relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which Plaintiff has a right to jury trial.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby designates Kansas City, Kansas as the place of trial in this case.

Respectfully submitted,

By: _/s/Michael Stipetich_____
Michael Stipetich   Kansas No. 21453
Smith Mohlman Injury Law, LLC
701 E. 63rd Street, 3rd Floor
Kansas City, MO 64110
816.866.7711(office)
816.866.7715(fax)
stip@accidentlawkc.com

**ATTORNEYS FOR PLAINTIFF**