## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Raven Henderson,**

        **Plaintiff,**

v.                                        **Case No. 21-cv-2194-JWL**

**Stormont-Vail Healthcare, Inc.,**

        **Defendant.**

### MEMORANDUM AND ORDER

Plaintiff filed this lawsuit against her former employer alleging race and color discrimination, racial harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.  This matter is presently before the court on defendant's motion for summary judgment on all claims (doc. 61).  As will be explained, the motion is denied as to plaintiff's claims that defendant terminated her employment based on her race/color and that defendant terminated her employment in retaliation for raising a complaint about race discrimination.  The motion is otherwise granted.

### I.     Facts

The following facts are stipulated in the pretrial order, uncontroverted, or related in the light most favorable to plaintiff as the nonmoving party.  Defendant Stormont-Vail Healthcare, Inc. is a not-for-profit healthcare system located in Topeka, Kansas.  In 2016, defendant hired Dr. Marc Baraban, a plastic surgeon who had practiced in Topeka for many years.  At that time, Dr. Baraban was the only plastic surgeon employed by defendant.  When it hired Dr. Baraban,

defendant acquired Dr. Baraban's office space on the second floor at 823 Mulvane Street, a medical clinic located near defendant's main campus and which housed other physicians employed by defendant.   Defendant hired Dr. Raven Henderson, the plaintiff in this case, in October 2017.   Plaintiff is also a plastic surgeon and was the first plastic surgeon to join defendant's plastic surgery practice after Dr. Baraban.  Plaintiff's race is African-American.

Before she began her employment with defendant, plaintiff had a conversation with Marc Davis, defendant's Director of Surgery Physician Services, about where her office would be located.  Mr. Davis's responsibilities included day-to-day oversight of the plastic surgery practice and other surgical clinics, supervising the nurse managers and advance practice providers, and fielding questions from surgeons.  Plaintiff asserts that she asked Mr. Davis for an office on the second floor of the clinic with the plastic surgery department and that her request was denied on the basis that the space was too small to accommodate another physician.  Defendant contends that plaintiff toured the second-floor space and that she determined that it was too small and outdated and that the parties then agreed that plaintiff's office would be on the third floor with the general surgeons.  According to defendant, an office on the third floor would provide plaintiff with plenty of space and the potential benefit of referrals for major cases from the general surgeons located on that floor.  In any event, plaintiff was assigned an office on the third floor.  It is uncontroverted that defendant's long-term plan was to build a new clinic that would accommodate defendant's growing plastic surgery department.

Almost immediately, plaintiff found herself at the center of workplace conflicts, particularly with Kathy Kufahl, the nurse manager for the plastic surgery clinic.  Ms. Kufahl described plaintiff as "rude and condescending" and had a litany of complaints about the way in

2

which plaintiff conducted her practice and the resulting burden that her methods placed on nursing staff. Plaintiff, in turn, believed that Ms. Kufahl was creating a "hostile work environment" for plaintiff by ensuring that plaintiff was not adequately supported with nursing staff and by favoring the second-floor practice to the detriment of the third-floor practice. This division only increased in August 2018, when defendant hired its third plastic surgeon, Dr. Heather Pena. Dr. Pena, unlike plaintiff, was given an office on the second floor of the clinic.

At that time, Drs. Baraban and Pena (both of whom identify as Caucasian) were assisted by Jennifer Bingham, a Licensed Practical Nurse (LPN), and Paula Knott, a Medical Assistant (MA). The second floor also included Ellen Dillard, the plastic surgery department's Patient Registrar. Plaintiff was assisted by Jennifer Hall, LPN, and Chelsea Session, MA. Ms. Session was the only other African-American employee in the plastic surgery department. Until the end of 2018, Ms. Hall and Ms. Session were located on the second floor of the clinic despite the fact that their provider, plaintiff, worked on the third floor. According to plaintiff's evidence, Ms. Hall and Ms. Session were expected to perform extra tasks on the second floor without regard to the tasks that they needed to perform to support plaintiff. And, again according to plaintiff, while Ms. Hall and Ms. Session tried to provide assistance on both the second and third floors, Ms. Bingham and Ms. Knott refused to help plaintiff when she needed additional support. Plaintiff contends that Ms. Kufahl contributed to this workload imbalance and refused to provide plaintiff with the staffing assistance that she needed. In addition, plaintiff contends that Ms. Dillard, with Ms. Kufahl's knowledge and support, intentionally omitted plaintiff's name from the name of the practice when answering the telephone and routinely refused to refer patients to plaintiff.

In early January 2019, Ms. Dillard was talking about her daughter's spouse, who is Black, in the presence of Ms. Knott, Ms. Bingham, Ms. Hall and Ms. Session.  Ms. Dillard stated that her son-in-law's skin tone was "blacker than black;" that sometimes her father-in-law referred to Ms. Dillard's daughter's spouse as a "nigger;" and asked Ms. Session, who is Black, whether anyone in her family "dates white people."  Plaintiff's evidence reflects that Ms. Dillard said the word "nigger" on two occasions during this interaction.  Ms. Hall reported this conversation to defendant's employee relations department and to plaintiff.  Ultimately, defendant issued a Coaching Improvement Plan to Ms. Dillard for using derogatory language.

On January 30, 2019, plaintiff met with Kari Kelly, defendant's Director of Employee Relations & Health, and Dr. William Sachs, a general surgeon and defendant's Vice President of Surgery responsible for supervising the employed surgeons at defendant.  The purpose of the meeting, which plaintiff recorded, was to discuss plaintiff's ongoing complaints about her working environment.  During this discussion, plaintiff again raised concerns about Ms. Kufahl's failure to provide sufficient staff to assist plaintiff; the way in which Ms. Dillard continued to omit plaintiff's name when answering the phone on behalf of the practice and continued to refer patients to other providers but not plaintiff; the fact that she was assigned an office on the third floor and, according to plaintiff, was told that space was not available on the second floor but space was made available for Dr. Pena; the failure of the second-floor nursing staff to assist plaintiff; and the general divisiveness between the second-floor and third-floor staffs.  In essence, plaintiff opined that the second-floor team members did not consider her part of the plastic surgery practice.  Plaintiff also raised the issue of Ms. Dillard's use of racial slurs in the workplace and she questioned Ms. Kelly and Dr. Sachs about whether Ms. Dillard's use of such language in the

workplace suggested that the conflicts that plaintiff and her staff were experiencing were the result of racial bias in the workplace.  As summarized by Ms. Kelly in a subsequent email to Mr. Davis in which she laid out plaintiff's concerns, plaintiff "feels that if this language is used it could be the reason patients are being redirected or coverage/teamwork is not provided."

Defendant asserts that Mr. Davis addressed each of plaintiff's concerns.  And while some concerns were resolved to plaintiff's satisfaction—Ms. Kufahl, for example, was transferred out of the department in February 2019—other concerns remained, such as Ms. Dillard's refusal to name plaintiff in her phone greeting.  It is undisputed, however, that Mr. Davis met individually with all members of the plastic surgery department and then together as a group in an effort to repair the relationships and find a path forward for everyone.  According to defendant, the plastic surgery team agreed to a fresh start in February 2018.  During this same time, Ms. Dillard transferred to another department.  Plaintiff, however, continued to complain to Dr. Sachs and Mr. Davis about the lack of staffing support from the second-floor staff.

Plaintiff contends that defendant began retaliating against her after she raised concerns about potential racial animus in the workplace.  Specifically, she asserts that in April 2019, the Medical Staff's Quality Improvement Committee affirmed a January 2019 peer review finding of "Standard of Care Level 2" (SOC 2) in connection with plaintiff's decision not to order an x-ray when a needle was discovered missing after a surgical procedure.  An SOC 2 finding means that the physician did not meet the standard of care but that the conduct was not reasonably likely to result in harm. She further asserts that defendant, in late April 2019, denied her surgical privileges at St. Francis Hospital despite the fact that other physicians had privileges there.

On August 1, 2019, plaintiff was performing a breast reduction surgery. During the procedure, Hailey Ogden, a nurse in the operating room, apparently believed that plaintiff was infiltrating breast tissue with tumescent solution after the tissue had been excised from the patient. By way of background, it is uncontroverted that the use of the "tumescent technique" during breast reduction is well-documented in medical literature. That technique involves infiltrating breast tissue with fluid prior to excising the tissue to minimize blood loss. Defendant, however, asserts that Ms. Ogden believed that plaintiff was infiltrating breast tissue that had already been excised from the patient. According to defendant, there is no medical benefit to the patient to infiltrate the tissue after excision from the patient. Defendant asserts that the only reason a physician would infiltrate tissue after excision would be to increase the weight of the tissue to meet insurance criteria for coverage of the procedure as being medically necessary rather than cosmetic.

Because Ms. Ogden, in defendant's words, "could not see clearly," she asked another operating nurse, Michelle Bailey, to come into the operating room to observe the procedure. Ms. Bailey testified that she observed plaintiff infiltrate breast tissue that had been excised from the patient. After the procedure, Ms. Bailey notified Steve Kash and relayed her observations. Mr. Kash is a nurse manager and Ms. Bailey's supervisor. Mr. Kash, in turn, reports to Angela Gamber, defendant's Administrative Director of Emergency Trauma, including operation rooms. Mr. Kash relayed Ms. Bailey's observations to Ms. Gamber, who then notified Dr. Sachs.[1] Dr.

---

[1] Defendant contends that Mr. Kash told plaintiff immediately following the procedure that the operating room nurses observed her infiltrating tissue after she had excised that tissue. But defendant's evidence—a muffled audio recording of the conversation that contains significant interference—does not support the assertion that Mr. Kash identified the timing of infiltration observed by the nurses, only that they observed her infiltrating the tissue with solution.

Sachs conducted an investigation into the August 1, 2019 breast reduction procedure performed by plaintiff.  According to defendant, Dr. Sachs interviewed the three employees in the operating room at the time—Ms. Bailey, Ms. Ogden and Leigh Ann Johnson, the surgical technologist.  In his interview report, Dr. Sachs wrote that Ms. Johnson indicated that she had seen plaintiff "inject each specimen with fluid once they were individually removed."  In her deposition, however, Ms. Johnson testified that she did not see plaintiff infiltrate any tissue with fluid after it was removed.[2] Ms. Johnson testified that she told Dr. Sachs that she witnessed plaintiff infiltrate the tissue with tumescent at the beginning of the procedure and that it was "one of the first things" that occurred.  According to Ms. Johnson, she expressly told Dr. Sachs that she "didn't see what Michelle saw or what Michelle claims to see."

On August 5, 2019, Dr. Sachs, Ms. Gamber and Mr. Davis met with plaintiff to discuss the August 1, 2019 breast reduction procedure.  Plaintiff recorded the meeting, unbeknownst to the others.  Dr. Sachs wrote in his report that when he, Ms. Gamber and Mr. Davis met with plaintiff to ask her about "injecting the specimen once it was removed," she stated that she injected the specimen because "the excised tissue can become dehydrated and desiccated" and that plaintiff "did not state any other reason for injecting the specimen once it was removed."  As evidenced by the audio recording, however, Dr. Sachs did not ask plaintiff about injecting the specimen "once it was removed."  Rather, Dr. Sachs told plaintiff that the operating room staff was "not quite certain" that they understood "why you injected the specimen" and if that was a "key part of your procedure" whether they needed to have "stuff available" for the procedure.  In response,

---

[2] While the parties and several witnesses use the terms "inject" and "infiltrate" interchangeably, Ms. Johnson explained that the appropriate term in this particular context is "infiltrate."

plaintiff explained in the first instance that, since May, she started using a different technique "where I use tumescent infiltration of the breast to decrease bleeding and try to decrease operative times" and that she had succeeded in reducing operative times by 30 to 45 minutes. Only then did plaintiff further explain that infiltration also compensates for weight that is otherwise lost through desiccation.

On August 27, 2019, Dr. Sachs forwarded his written report to Dr. Kevin Dishman, defendant's Chief Medical Officer and Quality Officer, and Kevin Steck, defendant's Chief Compliance Officer and General Counsel. Based on that written report, Dr. Dishman made the decision to terminate plaintiff's employment. The termination letter stated that defendant made the decision based on plaintiff's "repeatedly injecting the specimens with large volumes of liquid after removal as a means to enhance their weight and failing to document her actions in the medical record." Mr. Steck also reviewed the investigation and determined that he was required by state statute to report the incident to the Kansas Board of Healing Arts (BOHA), which licenses medical doctors. He submitted that report on or about August 30, 2019. Finally, in October 2019, the Medical Staff's initial peer reviewer issued an SOC 2 finding based on plaintiff's conduct in connection with the August 1, 2019 breast reduction procedure. Later that month, the Medical Staff's Quality Improvement Committee upgraded that finding to an SOC 4 finding, indicating that the standard of care was not met and that the conduct was egregious.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.      Summary Judgment Standard

8

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc*., 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a).   A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc*., 726 F.3d at 1143 (quotation omitted).   "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

### III.    Race and Color Discrimination

In the pretrial order, plaintiff asserts that defendant terminated her employment based on plaintiff's race and color.   Plaintiff concedes that she has no direct evidence of discrimination, and her claims are therefore analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Daniels v. United Parcel Serv., Inc*., 701 F.3d 620, 627 (10th Cir. 2012).    Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination.    *Id*.    To set forth a prima facie case of discrimination, plaintiff must establish "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." *Id.* (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)).   If she establishes a prima facie case, the burden shifts to defendant to assert a legitimate,

nondiscriminatory reason for the adverse employment action. *Id*. If defendant meets this burden, summary judgment against plaintiff is warranted unless she introduces evidence "that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id*. (citing *Simmons v. Sykes Enters*., 647 F.3d 943, 947 (10th Cir. 2011)).[3]

Defendant concedes that plaintiff has established a prima facie case of discrimination with respect to her discriminatory discharge claim.[4]  The court turns, then, to whether defendant has met its burden to articulate a legitimate, nondiscriminatory reason for the decision to terminate plaintiff's employment.  This "burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder Energy Servs., Inc*., 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142 (2000)).  The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that defendant has carried it here. *See id.* According to defendant, it terminated plaintiff's employment based on its belief that she had committed insurance fraud in connection with the August 1, 2019 breast reduction surgery performed by plaintiff.  The burden of proof, then, shifts back to plaintiff to show that defendant's proffered reason is pretextual.

Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Id.* at 1150 (quoting *Kendrick v.*

---

[3] The court's analysis of plaintiff's Title VII claims applies equally to her claims under § 1981. *See Payan v. United Parcel Serv.*, 905 F.3d 1162, 1168 (10th Cir. 2018).

[4] Plaintiff has clarified in her response brief that she is not bringing claims of race and color discrimination with respect to any discrete actions other than the termination of her employment.

*Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).  A plaintiff may also show pretext with evidence that the defendant had "shifted rationales" or that it had treated similarly situated employees differently.  *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011). In essence, a plaintiff shows pretext by presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction in the employer's stated reasons, such that a reasonable jury could find them unconvincing."  *Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013).

The record evidence, reviewed in the light most favorable to plaintiff, is sufficient to cast doubt on defendant's proffered reason.  Dr. Dishman avers that he made the decision to terminate plaintiff's employment after reviewing the written report of Dr. Sachs' investigation of the August 1, 2019 breast reduction procedure performed by plaintiff.[5]  But that report, when viewed with other evidence in the record, contains significant contradictions sufficient to permit a jury to question the veracity of the report.  In his report, Dr. Sachs asserts that "Leann,"[6] the surgical technologist for the procedure, was interviewed and that she stated that "she saw Dr. Henderson inject each specimen with fluid once they were individually removed."  But in her deposition, Ms. Johnson testified that she did not see plaintiff inject any tissue with fluid after it was removed.

---

[5] It appears that Dr. Dishman relied on Dr. Sachs' investigation without independently verifying the facts therein.  Thus, any discriminatory animus may be imputed to Dr. Dishman.  *Armstrong v. The Arcanum Grp., Inc.*, 897 F.3d 1283, 1290 (10th Cir. 2018) ("Under a cat's-paw theory of recovery (also known as 'subordinate bias' or 'rubber stamp' theory), an employer who acts without discriminatory intent can be liable for a subordinate's discriminatory animus if the employer uncritically relies on the biased subordinate's reports and recommendations in deciding to take adverse employment action.") (quoting *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015)).

[6] It is undisputed that Dr. Sachs' reference to "Leann" is in fact a reference to Leigh Ann Johnson.

Johnson depo. at 24:7-12.   She further testified that when Mr. Kash asked her immediately following the procedure whether she had seen anything unusual or inappropriate during the procedure, she told him that it was a "regular case" and had not seen anything unusual.   *Id.* at 27:1-7.   With respect to her interview with Dr. Sachs, Ms. Johnson testified that she told Dr. Sachs that she witnessed plaintiff infiltrate the tissue with tumescent at the beginning of the procedure and that it was "one of the first things" that occurred.   *Id.* at 31:6-11; *see also id.* at 42:15-21 (testifying that infiltrating the tissue at the beginning of the procedure is "the norm" and what plaintiff "always did").   According to Ms. Johnson, she expressly told Dr. Sachs that she "didn't see what Michelle saw or what Michelle claims to see."   *Id.* at 31:17-23.   Ms. Johnson's testimony, if credited, casts doubt on whether Dr. Sachs honestly believed the substance of his report.

Moreover, Dr. Sachs wrote in his report that when he, Ms. Gamber and Mr. Davis met with plaintiff to ask her about "injecting the specimen once it was removed," she stated that she injected the specimen because "the excised tissue can become dehydrated and desiccated" and that plaintiff "did not state any other reason for injecting the specimen once it was removed."   But the audio recording of this conversation contradicts this statement in two significant ways.   On the recording, plaintiff is not asked about injecting the specimen "once it was removed."   Rather, Dr. Sachs stated that operating room staff was "not quite certain" that they understood "why you injected the specimen" and if that was a "key part of your procedure" whether they needed to have "stuff available" for the procedure.   In response, plaintiff explained in the first instance that, since May, she started using a different technique "where I use tumescent infiltration of the breast to decrease bleeding and try to decrease operative times" and that she had succeeded in reducing

12

operative times by 30 to 45 minutes.  Only then did plaintiff further explain that infiltration also compensates for weight that is otherwise lost through desiccation.  It is uncontroverted that infiltrating the tissue would only decrease bleeding if the tissue had not been excised from the patient.  This evidence, then, contradicts Dr. Sachs' statement in the report that plaintiff was asked about "injecting the specimen once it was removed."  Based on the audio recording, a reasonable jury could conclude that Dr. Sachs, contrary to his assertion in the report, did not ask plaintiff about injecting the specimen after it was excised from the patient.  But plaintiff's explanation about decreasing blood loss also flatly contradicts Dr. Sachs' statement in his report that plaintiff offered no other reason for injecting the specimen.  She clearly did offer another reason for doing so and that reason supports the conclusion that, consistent with Ms. Johnson's testimony, plaintiff infiltrated the tissue before it was excised from the patient.  And this evidence is sufficient to show that Dr. Sachs did not genuinely believe that plaintiff had infiltrated the tissue after it was excised from the patient.

Because plaintiff's evidence would permit a reasonable jury to find that Dr. Sachs did not actually believe that plaintiff had infiltrated the tissue after it was excised from the patient and, in turn, that plaintiff had committed insurance fraud, a trial is required on plaintiff's discriminatory discharge claim.  Summary judgment on this claim is denied.

## IV.     Racial Harassment Claim

In the pretrial order, plaintiff contends that defendant subjected her to racial harassment sufficiently pervasive to alter the terms and conditions of her employment. To carry her burden, plaintiff must show that she is a member of a protected group; she was subject to unwelcome

harassment; the harassment was based on race; and due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of her employment and created an abusive working environment. *Payan v. United Parcel Service*, 905 F.3d 1162, 1170 (10th Cir. 2018); *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326-27 (10th Cir. 2004) (plaintiff asserting racial harassment must produce evidence that he or she was targeted for harassment based on race).[7]  As explained below, plaintiff's racial harassment claim fails and summary judgment on this claim is appropriate.

The only overtly race-based conduct that plaintiff relies on to support her claim of racial harassment is the single conversation that Ms. Dillard initiated in the workplace when she used the word "nigger" on two occasions; referred to her son-in-law's skin tone as "blacker than black;" and asked Ms. Session whether anyone in her family dated "white people."  Plaintiff concedes that this conversation took place outside her presence and that the racial slurs were not made in reference to her.  For these reasons, the comment carries less weight in the evaluation of plaintiff's claim. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887 (7th Cir. 2018) (comments not directed at the plaintiff and made outside the plaintiff's presence are not irrelevant but carry less weight).  Standing alone, this conduct clearly does not rise to the level of severe or pervasive harassment sufficient to permit a jury to conclude that the conditions of plaintiff's employment were altered.  A plaintiff "does not make a showing of a pervasively hostile work environment by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs. Instead, there must be a steady barrage of opprobrious racial comments." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d

---

[7] Again, the same substantive standards apply under Title VII and Section 1981. *Payan*, 905 F.3d at 1170.

675, 680 (10th Cir. 2007). No "steady barrage" is present here. Ms. Dillard's remarks, as a matter of law, did not make plaintiff's workplace permeated with discriminatory intimidation, ridicule and insult and falls far short of the "steady barrage" required for a racially hostile environment claim. *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (holding that two racially offensive remarks "[fell] far short of the 'steady barrage' required for a [racially] hostile environment claim").

To overcome this result, plaintiff insists that the "facially neutral" mistreatment she endured at work supports her racial harassment claim. "[W]hen a plaintiff introduces evidence of both race-based and race-neutral harassment, and when a jury, viewing the evidence in context, reasonably could view all of the allegedly harassing conduct as the product of racial hostility, then it is for the fact finder to decide whether such an inference should be drawn." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 960 (10th Cir. 2012). But here, plaintiff has not identified evidence that a reasonable jury could view as establishing a common thread of racial hostility between the disparate facially neutral conduct she highlights and Ms. Dillard's remarks. While Ms. Dillard's remarks were objectively offensive, there is no evidence that the conversation was tied to plaintiff's employment or was job-related in any respect. More importantly, the race-neutral conduct that plaintiff highlights was, according to plaintiff, primarily driven by people other than Ms. Dillard. Plaintiff, for example, complains that she was denied a second-floor office by Mr. Davis, Dr. Baraban and Deb Yocum, Mr. Davis's supervisor; that her request for a nurse practitioner to assist in the clinic was denied by Mr. Davis and Ms. Yocum; and that her request for privileges at St. Francis was denied by Mr. Davis, Dr. Sachs, and Mr. Kash. She complains that Ms. Bingham and Ms. Knott required her staff to perform extra work without performing

extra work themselves and that Ms. Bingham and Ms. Knott decorated the plastic surgery office with Christmas stockings for all staff members except plaintiff, Ms. Session and Ms. Hall. Plaintiff contends that Ms. Kufahl was largely responsible for the staffing problems experienced by plaintiff and for the second-floor office staff's refusal to schedule patients for her and to provide her with sufficient help.   She asserts that Mr. Kash targeted her for wearing earrings in the operating room and wrongfully accused her of violating hospital policy by ordering human tissue directly from a vendor.   None of this race-neutral conduct has any connection to Ms. Dillard or her remarks and plaintiff fails to show how any of this conduct was motivated by racial animus. Plaintiff does allege that Ms. Dillard intentionally omitted plaintiff's name when answering the telephone for the practice and declined to refer patients to plaintiff for scheduling purposes.  But even assuming this conduct was based on plaintiff's race, such evidence still falls far short of establishing racially offensive harassment sufficient to alter the terms of her employment.  See *Young v. City of Idabel*, 721 Fed. Appx. 789, 800-01 (10th Cir. 2018) (evidence that employees were disrespectful and insubordinate to plaintiff, coupled with evidence that superiors wrongfully investigated plaintiff, was not sufficient to establish racially hostile environment in the absence of any evidence that such conduct was motivated by racial animus; and single racial epithet made outside plaintiff's presence had "minimal polluting effect").

The court recognizes that it is required to take a "holistic" approach in analyzing plaintiff's evidence of a racially hostile work environment, *Lounds v. Lincare, Inc*., 812 F.3d 1208, 1227 (10th Cir. 2015), but that analysis does not support a finding that plaintiff's environment was "polluted" with racially offensive harassment.  Viewed in the light most favorable to plaintiff, the conduct she describes simply does not rise to the level of pervasiveness required to establish a

16

hostile work environment claim under Tenth Circuit precedent. Stated another way, plaintiff has failed to set forth a genuine issue of material fact as to whether the conduct was sufficiently pervasive so as to alter the terms and conditions of her employment. Tellingly, in cases involving far more egregious facts than those alleged by plaintiff, the Circuit has held that the evidence of pervasiveness was a "close" question. *Id.* at 1213-17, 1227 (10th Cir. 2015) (involving multiple and continual references to racial stereotypes, a discussion of lynching, habitual use of the term "nigga" and references to "the hood," and direction to address a vice president with "yes massa"); *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680-82, 683 (10th Cir. 2007) (involving several discrete incidents of racial harassment over four years and ongoing harassment, including comments referring to plaintiff's ethnicity every two to three days). Defendant's motion for summary judgment on plaintiff's racial harassment claim is granted.

## V.      Retaliation

Finally, plaintiff asserts that defendant retaliated against her for making a complaint of race discrimination. To state a prima facie case for retaliation, plaintiff must show that (1) she engaged in protected opposition to discrimination, (2) a reasonable worker would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action. *Daniels v. United Parcel Service, Inc.*, 701 F.3d 620, 638 (10th Cir. 2012). If plaintiff presents a prima facie case of retaliation, then defendant must respond with a legitimate, nonretaliatory reason for the challenged action. *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017). If defendant satisfies this burden, plaintiff must show that defendant's reason was merely a pretext for retaliation. *Id.*

In its motion for summary judgment, defendant first asserts that all of plaintiff's retaliation claims fail because she cannot establish that she engaged in protected opposition to discrimination. To establish the first prong of her prima facie case of retaliation, plaintiff must show that she had a reasonable, good-faith belief that she was opposing discrimination prohibited by Title VII. *See Crumpacker v. Kansas Dep't of Human Resources*, 338 F.3d 1163, 1171 (10th Cir. 2003). A plaintiff need not establish an "actual violation" of the statute. *Hertz v. Luzenac Am., Inc*., 370 F.3d 1014, 1015–16 (10th Cir. 2004) (plaintiff need not prove actual violation of Title VII but only a "reasonable, good-faith belief" that the conduct was prohibited by Title VII). According to defendant, plaintiff's January 30, 2019 complaint about Ms. Dillard's use of a racial slur does not, as a matter of law, constitute protected activity. In support of this argument, defendant directs the court to two Tenth Circuit cases strongly suggesting that reporting an isolated remark by a coworker generally does not qualify as protected activity for purposes of a retaliation claim. *See Robinson v. Cavalry Portfolio Servs., LLC*, 365 Fed. Appx. 104, 106 (10th Cir. 2010); *Gaff v. St. Mary's Regional Med. Ctr.*, 506 Fed. Appx. 726, 727 (10th Cir. 2012). Defendant also highlights that Ms. Dillard was not plaintiff's supervisor; Ms. Dillard was not referring to plaintiff when she made the remark; plaintiff was not present for the remark; and Ms. Dillard, at least according to defendant's evidence, was using the slur only in the context of illustrating how other people harbor discriminatory views. Defendant, then, urges that no reasonable person could believe that Ms. Dillard's conduct violated plaintiff's Title VII rights.

The problem with defendant's argument is that defendant has misconstrued the nature of plaintiff's complaint. Viewing the evidence in the light most favorable to plaintiff, plaintiff's complaint was not limited to reporting Ms. Dillard's remarks. Rather, as plaintiff explained to

Ms. Kelly and Dr. Sachs during her January 30, 2019 meeting, the language used by Ms. Dillard made plaintiff wonder whether the host of conflicts that she and her staff were experiencing in the workplace—conflicts that plaintiff was otherwise struggling to explain—stemmed from racial bias.  Plaintiff told Ms. Kelly and Dr. Sachs that because Ms. Dillard was "bold enough" to use such language in the workplace and in the presence of Black employees, that particular incident caused her to question whether other people in the workplace harbored racial bias against plaintiff, which would explain efforts to exclude her from the plastic surgery team.  Even Ms. Kelly, in her email to Mr. Davis, recognized that plaintiff's concerns about race discrimination were much broader than defendant suggests in its motion.  Viewed through the appropriate lens, then, plaintiff clearly engaged in protected opposition to discrimination on January 30, 2019.

Defendant next moves for summary judgment on each of plaintiff's retaliation claims other than her termination claim on the grounds that plaintiff has failed to come forward with sufficient evidence of causation, the third prong of plaintiff's prima facie case.  Aside from her retaliatory discharge claim, plaintiff asserts that defendant retaliated against her by issuing her an SOC 2 finding in connection with her decision not to order an x-ray when a needle was discovered missing after a surgical procedure; by denying her surgical privileges at St. Francis Hospital on April 30, 2019; by reporting plaintiff to the Kansas State Board of Healing Arts in late August 2019; and by upgrading its initial SOC 2 finding to a SOC 4 finding after a full consideration of the August 1, 2019 breast reduction procedure.  As will be explained, the court agrees with defendant that summary judgment is appropriate on each of these claims.

*SOC 2 Finding for Failure to Order X-Ray*

19

On January 28, 2019, the Medical Staff's initial peer reviewer issued an SOC 2 finding based on plaintiff's refusal to order an x-ray after a needle was discovered missing from the field. On April 19, 2019, the Medical Staff's Quality Improvement Committee affirmed the SOC 2 finding. Significantly, the initial SOC 2 decision was made before plaintiff's discrimination complaint.[8] Because the subsequent decision affirming that finding was consistent with the initial finding, the mere fact that the subsequent decision occurred less than three months after her complaint is not evidence of causation. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Morgan v. Hilti, Inc*., 108 F.3d 1319, 1324 (10th Cir. 1997) ("Hilti issued oral and written warnings about the consequences of poor attendance both before and after August 3, 1994, when she filed the charge of discrimination. The additional warnings, followed by discharge on January 16, 1995, simply completed the disciplinary process already set in motion."); *Mitchell v. Kan. City Kan. Sch. Dist*., 714 Fed. Appx. 884, 888 (10th Cir. 2017) ("[T]he temporal proximity between Mr. Mitchell's EEOC charge and his termination a month and a half later is immaterial under these circumstances because, as

---

[8] Plaintiff alleges that she complained in November 2018 and on January 11, 2019 about a "hostile work environment." But there is no evidence that these complaints contained any reference to race discrimination or any race-based issue. Rather, the evidence reflects only that plaintiff was complaining about conflicts and tension within the office that made the environment "hostile" according to plaintiff. The court, then, rejects the suggestion that these complaints constitute protected activity within the meaning of Title VII. *See Lucas v. Office of Colorado State Pub. Def*., 705 Fed. Appx. 700, 706 (10th Cir. 2017) (vague complaint about a "hostile work environment" did not constitute protected activity without indication that misconduct was motivated by race, gender or other category protected by Title VII).

indicated above, the school district had already initiated disciplinary proceedings as a result of the October 30, 2015 incident involving the police."). Because plaintiff offers no other evidence of causation, summary judgment on this claim is warranted.

Moreover, it is axiomatic that a plaintiff asserting a claim of retaliation "must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to take adverse action against him had knowledge of his protected activity." *Singh v. Cordle*, 936 F.3d 1022, 1043 (10th Cir. 2019). Plaintiff has no evidence (and, in fact, makes no argument) that any members of the Quality Improvement Committee who were present at the April 19, 2019 meeting had any knowledge of plaintiff's January 30, 2019 complaint of race discrimination.[9] Indeed, the court cannot find in the record any evidence concerning the makeup of the voting members present at the April 19, 2019 meeting of the Quality Improvement Committee. Without evidence that these committee members had knowledge of plaintiff's complaint, plaintiff necessarily cannot establish the requisite causation between her complaint and the SOC 2 finding. Summary judgment, then, is appropriate for this reason as well.

*Denial of Privileges at St. Francis Hospital*

On April 30, 2019, the Medical Staff's Operating Committee denied plaintiff's request for privileges at St. Francis Hospital. The record reflects that plaintiff first requested privileges at St. Francis in October 2018, before she made a discrimination complaint. Her request was denied at that time by the Operating Committee and she was notified of the decision by Dr. Sachs and Mr.

---

[9] Plaintiff asserts only that "defendant" issued a second SOC 2 finding against her, without any effort to identify who made that decision or how that decision was made.

Davis.  Her subsequent request for privileges at St. Francis Hospital was brought to the Operating Committee at its April 30, 2019 meeting.  Consistent with its initial decision, the Operating Committee again denied the request.  Because the subsequent decision was consistent with the initial decision, the mere fact that the subsequent decision occurred less than three months after her complaint is not evidence of causation.  *See Breeden*, 532 U.S. at 272; *Hilti, Inc*., 108 F.3d at 1324; *Mitchell*, 714 Fed. Appx. at 888.  As plaintiff offers no other evidence of causation, summary judgment on this claim is warranted.

Moreover, plaintiff has come forward with no evidence that the Operating Committee had knowledge of plaintiff's January 30, 2019 complaint.  While the record reflects Dr. Sachs was one of 15 members on the committee, plaintiff has no evidence (and, again, makes no argument) that Dr. Sachs shared his knowledge of plaintiff's complaint with the committee or that he influenced the committee's decision in any way.  There is no evidence that the committee relied on a recommendation by Dr. Sachs instead of independently determining as a body that plaintiff's request should be denied.  In short, plaintiff has not even argued much less shown that any alleged retaliatory bias on the part of Dr. Sachs impacted the Operating Committee's decision to deny plaintiff's request for privileges at St. Francis. *See Singh*, 936 F.3d at 1039 (rejecting argument that committee's decision was infected by biased subordinate where there was no evidence of causal chain between alleged bias and committee's decision); *Flores v. DeJoy*, 2021 WL 2186240, at *10 (D.N.M. May 28, 2021) (plaintiff could not establish causation element of retaliation claim where he had no evidence that his protected activity was mentioned, much less considered, when five-person committee made employment decision and only one member of the committee knew about protected activity).

22

*Report to BOHA*

Plaintiff also challenges "defendant's" decision to report plaintiff to the Kansas Board of Healing Arts (BOHA) without any argument as to how any alleged retaliatory bias on the part of Dr. Sachs might be imputed to Mr. Steck, the individual who reported plaintiff to the BOHA. She does not argue that Mr. Steck had knowledge of her discrimination complaint. She does not invoke the "cat's paw" theory of liability or any other basis for imputing any bias to Mr. Steck. And even assuming that Dr. Sachs's investigation was tainted by retaliatory bias, plaintiff has come forward with no evidence that Dr. Sachs intended for Mr. Steck to report her to the BOHA. *See Singh*, 936 F.3d at 1038 (for cat's paw theory of liability, plaintiff must show that subordinate intended to cause the adverse action). Significantly, plaintiff admits that Mr. Steck independently determined that he was required by statute to report the August 1, 2019 incident to the BOHA. Specifically, Kansas law provides that

> (a) Subject to the provisions of subsection (c) of K.S.A. 65-4923, and amendments thereto, a medical care facility licensed under K.S.A. 65-425 et seq., and amendments thereto, shall, and any person may, report under oath to the state board of healing arts any information such facility or person has which appears to show that a person licensed to practice the healing arts has committed an act which may be a ground for disciplinary action pursuant to K.S.A. 65-2836, and amendments thereto.

Kan. Stat. Ann. § 65-28,121. Because plaintiff has not articulated any basis to impute any retaliatory bias to Mr. Steck, summary judgment on this claim is granted.

*SOC 4 Finding for Breast Reduction Procedure*

In October 2019, the Medical Staff's initial peer reviewer issued an SOC 2 finding based on plaintiff's conduct in connection with the breast reduction procedure.  Later that month, the Medical Staff's Quality Improvement Committee upgraded that finding to an SOC 4.  Plaintiff alleges that the decision to upgrade the SOC finding was retaliatory.  But, again, plaintiff has not established (or argued) that the Quality Improvement Committee had knowledge of her January 30, 2019 complaint.  She simply asserts that "defendant" upgraded the SOC finding without any discussion about who made that decision or how that decision was made.  In any event, the record reflects that there were 19 voting members of the Quality Improvement Committee at the October 2019 meeting at which the upgrade decision was made.  While Dr. Sachs was one of those members, there is no evidence that he influenced the decision in any way or that he shared his knowledge of plaintiff's complaint.  In fact, the facts concerning plaintiff's conduct concerning the breast reduction procedure were presented to the Committee by Dr. John Chamberlin.  The record is devoid of any evidence or argument that Dr. Chamberlin had knowledge that plaintiff had complained of race discrimination and plaintiff makes no argument that any retaliatory bias on the part of Dr. Sachs must be imputed to the Committee.  In such circumstances, plaintiff's claim must fail.  *See Singh*, 936 F.3d at 1039; *Flores*, 2021 WL 2186240, at *10.

*Termination of Employment*

As plaintiff has not established causation with respect to any other retaliation claims, the court is left with her claim that defendant terminated her employment in retaliation for her January 2019 complaint of race discrimination.  With respect to this claim, defendant contends that plaintiff cannot establish causation and, in any event, cannot establish pretext.  But because there

24

is no evidence that Dr. Dishman did anything other than rubber stamp Dr. Sachs' written report in deciding to terminate plaintiff's employment, retaliatory bias may be imputed to Dr. Dishman regardless of whether he knew about plaintiff's complaint. *Armstrong v. The Arcanum Grp., Inc.*, 897 F.3d 1283, 1290 (10th Cir. 2018) ("Under a cat's-paw theory of recovery (also known as 'subordinate bias' or 'rubber stamp' theory), an employer who acts without discriminatory intent can be liable for a subordinate's discriminatory animus if the employer uncritically relies on the biased subordinate's reports and recommendations in deciding to take adverse employment action.") (quoting *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015)).  And to the extent defendant otherwise challenges the causation element of plaintiff's prima facie case, plaintiff appropriately relies on her evidence of pretext to support causation as well.  *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007) (noting that the Circuit has considered pretext evidence in the prima facie stage of a retaliation claim) (citing *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003) (considering evidence of pretext in analyzing the causation element of a prima facie case of retaliation under Title VII)).  As more fully explained in connection with plaintiff's discrimination claim, plaintiff has come forward with evidence from which a jury could reasonably conclude that defendant's proffered reason for her termination was pretextual.  Summary judgment on this claim, then, is denied.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment on all claims (doc. 61) is **granted in part and denied in part**.  The motion is denied as to plaintiff's claims that defendant terminated her employment based on her race/color

and that defendant terminated her employment in retaliation for raising a complaint about race discrimination.  The motion is otherwise granted.

**IT IS SO ORDERED.**

Dated this __13th__ day of June, 2022, at Kansas City, Kansas.

                                        s/ John W. Lungstrum
                                        _____
                                        John W. Lungstrum
                                        United States District Judge

26