## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Raven Henderson,**

          **Plaintiff,**

**v.**                                        **Case No. 21-cv-2194-JWL**

**Stormont-Vail Healthcare, Inc.,**

          **Defendant.**

## <u>MEMORANDUM AND ORDER</u>

Plaintiff filed this lawsuit against her former employer alleging race and color discrimination, racial harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.  In June 2022, the court granted in part and denied in part defendant's motion for summary judgment.  Specifically, the court denied the motion with respect to plaintiff's claims that defendant terminated her employment based on her race/color and that defendant terminated her employment in retaliation for raising a complaint about race discrimination.  The court granted the motion on all other claims.  This matter is presently before the court on defendant's motion to reconsider (doc. 79) that aspect of the court's memorandum and order denying summary judgment on plaintiff's termination claims.  The motion is denied.

In its motion to reconsider, defendant asserts three errors on the court's part:  that the court misapprehended and misapplied the "cat's paw" theory of liability; that the court misapprehended the record evidence in conducting its pretext analysis; and the court improperly lessened plaintiff's pretext burden by permitting plaintiff to proceed to trial based solely on evidence that Dr. Sachs'

explanation was unworthy of belief when, according to defendant, disbelief is insufficient to show pretext.   In resolving defendant's motion, the court assumes familiarity with the court's memorandum and order resolving the motion for summary judgment and the parties' factual showing on summary judgment.

*Cat's Paw*

Defendant asks the court to reconsider its memorandum and order denying summary judgment on the grounds that the court misapprehended and misapplied the "cat's paw" theory of liability.  By way of background,

> [t]he "cat's paw" doctrine derives its name from a fable, made famous by La Fontaine, in which a monkey convinces an unwitting cat to pull chestnuts from a hot fire. *See* Fables of La Fontaine 344 (Walter Thornbury trans., Chartwell Books 1984). As the cat scoops the chestnuts from the fire one by one, burning his paw in the process, the monkey eagerly gobbles them up, leaving none left for the cat. *Id.* Today the term "cat's-paw" refers to "one used by another to accomplish his purposes." Webster's Third New International Dictionary Unabridged 354 (2002). In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.

*EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006). Defendant first argues that the court erred by not applying the controlling law on the cat's paw theory.  This argument, however, rests on defendant's own significant misperceptions of the law. Specifically, defendant apparently believes that the cat's paw theory of liability applies only to explicitly discriminatory conduct engaged in by a coworker and that a "pretext by falsity" analysis has no bearing on the cat's paw theory.  *See*, *e.g.*, Doc. 79, Def. Motion to Reconsider at 5 ("The 10th Circuit's precedent shows that the cat's paw theory's first element requires <u>explicit</u>

2

discriminatory conduct from the subordinate.") (emphasis by defendant); Doc. 62, Def. Memorandum in Support of its Motion for Summary Judgment at 46 (an adverse employment action must be made by a supervisor "unless a cat's paw theory applies;" cat's paw theory applies to employees "who have no authority over the plaintiff"); Doc. 81, Def. Reply on Motion to Reconsider at 3 ("Pretext by falsity analysis . . . is not the type of evidence the cat's paw theory requires when demonstrating discriminatory animus.").

To be clear, the cat's paw theory of liability applies when a plaintiff seeks to hold his or her employer liable "for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v. Proctor Hosp*., 562 U.S. 411, 415 (2011). Thus, while the doctrine could apply to a coworker if that coworker's alleged bias could be imputed to the person who made the adverse decision, the subordinate bias is clearly not limited to coworkers of the plaintiff. In support of its argument that the doctrine requires a showing of "explicit discriminatory conduct," defendant cites to no case that recognizes that bright-line rule. Rather, defendant cites to two cases in which the Circuit found that remarks bearing on race or sex, coupled with additional circumstantial evidence, were sufficient to establish the requisite animus for purposes of summary judgment, and two cases where, according to defendant, the Circuit found that circumstantial evidence of animus was insufficient. *See Sasser v. Salt Lake City Corp*., 772 Fed. Appx. 651, 661 (10th Cir. 2019); *Villamar v. Lincare, Inc*., 624 Fed. Appx. 658, 662 (10th Cir. 2015).

Contrary to defendant's characterization of *Sasser*, the Circuit actually found that the evidence, viewed in the plaintiff's favor, supported an inference of discriminatory animus. *Sasser*, 772 Fed. Appx. at 659 ("Nonetheless, the evidence, construed in Sasser's favor, supports an

3

inference that race was at least a motivating factor in Landgren's decision against interviewing Sasser for the position."). The only evidence that the plaintiff had to show animus was that his supervisor "scrutinized and secretly recorded [his] missteps in a file." *Id*. In his deposition, the supervisor admitted that he kept the file in case the plaintiff "pulled the race card" in the event of disciplinary action. *Id*. According to the Circuit, that evidence was sufficient to support an inference of discriminatory animus. *Id*. Nothing about *Sasser* indicates a requirement that statements of explicit bias must exist to show discriminatory animus for purposes of the cat's paw theory. In *Villamar*, the Circuit held that evidence that the allegedly biased subordinate provided false information to the decisionmaker was insufficient to support an inference of retaliatory bias not because the record was devoid of explicit retaliatory bias but because the inference under the facts of that case was "illogical." 624 Fed. Appx. at 662.

Moreover, a plaintiff is not required to come forward with evidence of explicit discriminatory or retaliatory bias to support an inference of bias. As the Circuit explained in *Singh v. Cordle*, 936 F.3d 1022, 1038 (10th Cir. 2019), a plaintiff relying on the subordinate bias theory must show that there is a genuine issue of material fact that, among other things, "the subordinate took action motivated by discriminatory animus." 936 F.3d 1022, 1038 (10th Cir. 2019). In an unpublished decision referencing *Singh* and the cat's paw theory, the Circuit held that a plaintiff's race, gender and retaliation claims required a jury trial where the plaintiff's evidence of bias included only (1) that the supervisor had knowledge of the plaintiff's discrimination complaint; and (2) the supervisor treated plaintiff differently than similarly situated employees outside the protected class with respect to the application of various work rules and attendance policies. *See Mann v. XPO Logistics Freight, Inc.*, 819 Fed. Appx. 585, 604-05, 609-10 (10th Cir. 2020). There

4

was no evidence of explicit discriminatory or retaliatory conduct in *Mann.* Nonetheless, the Circuit concluded that the plaintiff set forth sufficient evidence of pretext to raise an inference of discrimination and retaliation, and that because the decisionmaker ostensibly relied solely on the recommendation of the biased supervisor consistent with the cat's paw theory, the district court erred in granting summary judgment on those claims. *Id.* Defendant's contention, then, that the cat's paw theory requires evidence of explicit discriminatory or retaliatory conduct is not accurate.

In a related vein, defendant contends that a "pretext by falsity" analysis is wholly separate from the cat's paw theory and cannot support an inference that the allegedly biased supervisor acted with the requisite discriminatory animus. But as indicated in *Mann*, a traditional pretext analysis may be used to create that inference depending on the particular factual circumstances of a specific case. And in another unpublished decision, the Circuit has recognized that falsity in a report authored by the supervisor, in appropriate circumstances, can support an inference of discriminatory animus. *See Llamas v. QC Fin. Servs., Inc.*, 621 Fed. Appx. 906, 913-14 (10th Cir. 2015) (under specific facts of case, a reasonable jury could not find that a single inaccurate report—describing behavior wholly consistent with a series of prior uncontroverted incidents— was sufficient to show that supervisor harbored discriminatory animus toward plaintiff for purposes of cat's paw theory); *see also Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 515 (10th Cir. 2015) (discussing whether the plaintiff's evidence about the contents of the report about the incident that led to the plaintiff's termination was sufficient to create inference of retaliatory animus on the part of the supervisor who made the report; concluding that such evidence was not sufficient, but emphasizing that the plaintiff did not contend that the actual contents of the report were false or dishonest). The court, then, rejects the argument that a plaintiff relying on the

subordinate bias theory of liability cannot, as a matter of law, rely on evidence of falsity to establish an inference of animus.

Defendant also contends that the court erred by failing to apply each of three elements of the cat's paw theory of liability set forth in *Singh*.  But defendant never moved for summary judgment on this theory of liability with respect to plaintiff's termination claims.[1]  Defendant only mentioned the cat's paw theory in connection with plaintiff's hostile work environment claim, based on its misunderstanding that the theory applied only to express statements of bias made by coworkers.  If defendant had understood the nature of a subordinate bias claim, it presumably would have recognized that plaintiff, based on the evidence developed through discovery, was relying on the subordinate bias theory to prove employer liability for her termination.[2]  And, if defendant had recognized that liability in this case is based on a theory of subordinate bias, it presumably would have moved for summary judgment on it.  It did not.  The court, then, was certainly not required to engage in an evidentiary analysis of whether plaintiff's evidence was sufficient to proceed to trial on that issue.

In any event, plaintiff clearly set forth this theory in her response to summary judgment. In connection with her termination claims, plaintiff argued that Dr. Sachs "was instrumental in the personnel decisions that affected plaintiff" and then explained the subordinate bias theory, referencing a litany of Tenth Circuit cases explaining that theory. To the extent defendant was surprised by plaintiff's articulation of this theory, it could have objected to plaintiff's failure to

---

[1] In contrast, the defendant in *Singh* moved for summary judgment on the plaintiff's subordinate bias theory, clearly teeing that issue up for resolution on summary judgment.

[2] In its own submissions, defendant admits that Dr. Sachs conducted the investigation of plaintiff's conduct and that Dr. Dishman made the decision to terminate "based on this investigation."

articulate that theory in the pretrial order.  The court does not mean to suggest that plaintiff was required to articulate that theory in the pretrial order—it has no need to decide that issue in this case and expresses no opinion on it.  But by failing to object to plaintiff's reliance on that theory in her response to the motion for summary judgment, defendant waived any objection to it.

To the extent defendant was not surprised by plaintiff's reliance on this theory (and again, based on the record evidence it should have understood that plaintiff was relying on that theory), it could have used its reply brief to explain to the court how the evidence failed to create a genuine issue of material fact on the elements outlined in *Singh*.  It failed to do so.  While defendant in its reply referenced *Singh* and the three elements set forth therein, it simply argued that "Henderson does not show any of the elements from *Singh*."  That single sentence is the extent of its argument. That sentence is certainly not sufficient for the court to engage in an analysis of whether plaintiff's evidence was sufficient to survive summary judgment on the subordinate bias theory.  *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider . . . issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation.").  Thus, in the court's memorandum and order, it merely touched on the theory to indicate that plaintiff was relying on it to connect the dots between Dr. Sachs and Dr. Dishman. But in any event, even if defendant had argued in its reply brief that the evidence failed to create a genuine issue of material fact on the elements outlined in *Singh*, the court likely would not have addressed that argument.  *See Lynch v. Barrett*, 703 F.3d 1153, 1160 n.2 (10th Cir. 2013) (court does not consider arguments raised for the first time in reply brief).

For the foregoing reasons, the court rejects defendant's argument that the court committed numerous errors with respect to the cat's paw theory of liability.

*Pretext Analysis*

Defendant next argues that the court misapprehended the record evidence in its pretext analysis. By way of background, the court found that plaintiff had satisfied her pretext burden by, among other things, evidence from which a jury could conclude that Leigh Ann Johnson, contrary to what was indicated in Dr. Sachs' report, told Dr. Sachs that she did not see plaintiff infiltrate tissue after it had been excised from the patient. Defendant's primary complaint is that the court misunderstood Ms. Johnson's deposition testimony and ignored her signed contemporaneous statement.

Significantly, defendant did not submit Ms. Johnson's deposition or her signed statement in support of its motion for summary judgment. Perhaps because Ms. Johnson's deposition testimony complicated the issues for defendant, it simply chose to ignore it. In response to the motion, plaintiff highlighted portions of Ms. Johnson's testimony as well as her signed statement and argued that these materials created a factual dispute for trial on the issue of whether Dr. Sachs honestly believed that plaintiff had committed insurance fraud as he indicated in his report that led to her termination. While defendant responded to plaintiff's factual statements concerning Ms. Johnson, defendant did not address plaintiff's pretext argument as it related to Ms. Johnson in its reply brief. In fact, defendant never mentioned Ms. Johnson in the argument portion of its reply brief. To the extent, then, that defendant accuses the court of misquoting and mischaracterizing the evidence concerning Ms. Johnson, it should have addressed the pertinent evidence concerning Ms. Johnson and challenged plaintiff's argument in its reply brief.

In any event, the court remains convinced that Ms. Johnson's deposition testimony is sufficient to cast doubt on whether Dr. Sachs honestly believed the key statements in his report. While defendant insists that Dr. Sachs was entitled to rely on Ms. Johnson's contemporaneous statement (rather than her allegedly inconsistent deposition testimony years later), defendant misses the point that Ms. Johnson's deposition testimony permits an inference that, at the time of her interview with Dr. Sachs, she told him that she had not seen plaintiff infiltrate the tissue once it was removed from the patient. In other words, Ms. Johnson did not simply "change her story" by the time she was deposed; her testimony permits an inference that she told Dr. Sachs, at the time she was interviewed just after the surgery, that she had not seen plaintiff infiltrate the tissue after it was removed. This, then, calls into question whether the written statement authored by Dr. Sachs and signed by Ms. Johnson contained facts that Dr. Sachs knew were not true.[3] Contrary to defendant's insistence, then, a jury could conclude that Dr. Sachs, at the time of his investigation, knew that Ms. Johnson had not seen plaintiff infiltrate the tissue once it was removed. The remainder of defendant's argument about the Johnson evidence would require the court to assess the credibility of Ms. Johnson. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

---

[3] The statement drafted by Dr. Sachs was a detailed statement that incorporated facts concerning his interviews with other employees as well. It was signed by several people, including Ms. Johnson. The vast majority of the statement had nothing to do with Ms. Johnson and included facts outside her knowledge.

Defendant also argues that the court ignored what defendant construes as an admission on the part of plaintiff that she infiltrated the tissue for the purpose of meeting insurance criteria for coverage. According to defendant, this admission occurred at the end of a discussion that plaintiff had with Dr. Sachs on August 5, 2019 that plaintiff recorded. On that recording, Dr. Sachs can be heard telling plaintiff that the operating room staff was "not quite certain" that they understood "why you injected the specimen." Plaintiff responded:

> I have since May started using a different technique where I use tumescent infiltration of the breast to decrease bleeding and try to decrease operative times and its twofold actually, and it has worked . . . to a decent extent, I think I have knocked off 30-45 minutes from the operative time. In addition to that, our studies have shown that in certain patients, well in all patients, when you send off the specimen to the lab, it loses a certain amount of its weight by dessication, prior to arrival, and if I am close on a specimen, I will add, what our studies show the amount of dessication is per 100 grams of tissue with the infiltrate, and that's what they saw me doing on Thursday, and they questioned that. And I told them, this is not any different from . . . you know, things that I've done in the past . . . this is almost the same as if I were injecting it prior to the procedure.

Defendant asserts that plaintiff's explanation is a clear admission that she infiltrated the tissue for the purpose of increasing the weight of the specimen to meet insurance criteria for coverage.

Defendant's argument is not one that it made in its motion for summary judgment. In its motion, defendant focused on the fact that plaintiff clearly infiltrated the tissue *after it had been removed,* that doing so would have no medical benefit for the patient and, so, must have been done for the sole purpose of meeting insurance criteria. On that point, the court concluded that a jury could infer from the audio recording that plaintiff infiltrated the tissue during the course of the procedure (but not after removal) to serve the "twofold" purpose of decreasing bleeding and,

as an added bonus, of compensating for dessication.[4]   Now, defendant asserts that it does not matter if the tissue was removed—for even if plaintiff was infiltrating attached tissue for the purpose of compensating for dessication, such infiltration would serve no medical purpose and supported Dr. Sachs' belief that she had committed insurance fraud.

A jury could certainly conclude, as defendant has concluded, that plaintiff admitted to infiltrating the tissue for the purpose of meeting insurance criteria for coverage and that her admission supports Dr. Sachs' belief that she committed insurance fraud.  But a jury could also infer that plaintiff infiltrated the tissue at various times prior to removal to decrease bleeding, while recognizing that such infiltration had the added benefit of compensating for dessication. The point is that a jury must resolve these factual disputes and must resolve what plaintiff meant by her statements on the audio recording and what Dr. Sachs honestly believed when he authored the report that led to plaintiff's termination.  The court understands that this case presents a close question on summary judgment.  But the court reiterates its earlier finding that plaintiff has come forward with sufficient evidence to cast doubt on defendant's proffered reason for terminating her employment.  A jury trial is required.

*Pretext Burden*

In its memorandum and order denying summary judgment on plaintiff's termination claims, the court held that plaintiff survived summary judgment because the record evidence was

---

[4] In her deposition, plaintiff testified that she infiltrated the tissue prior to the procedure and at other points during the course of the procedure to decrease bleeding.  She testified that she did not infiltrate tissue after it had been removed.

sufficient to cast doubt on defendant's proffered reason for terminating plaintiff's employment. More specifically, the court found that a reasonable jury could conclude that Dr. Sachs did not actually believe the contents of the report that he authored and that the report contained statements that Dr. Sachs knew were untrue. Because this report formed the basis for the termination decision, the court held that a jury, if it found that Dr. Sachs did not genuinely believe what he wrote in his report, could find in plaintiff's favor on her termination claim.

Defendant asserts that the court "watered down" the Tenth Circuit's test in *Young v. Dillon Companies, Inc.*, 468 F.3d 1243 (10th Cir. 2006) by allowing plaintiff to establish pretext based on evidence that the stated reason is unworthy of belief. According to defendant, *Young* requires not only a showing that the stated reason is unworthy of belief but also a showing that the falsity "was a subterfuge for discrimination." *Young*, 468 F.3d at 1250. The court flatly rejects defendant's reading of *Young*. In that case, the Circuit simply reiterated that evidence about the falsity of an employer's proffered race-neutral explanation for termination will not "always be adequate to sustain . . . liability." *Id*. (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 148, (2000). The facts of *Young* are critical to understanding this statement. In *Young*, the defendant asserted that it had fired the plaintiff for leaving his shift two hours early and failing to clock out when he did so. *Id*. at 1246-47. In fact, video evidence showed the plaintiff putting on his coat, leaving the premises without clocking out, and not returning. *See id.* at 1248-49. On summary judgment, plaintiff came forward with evidence that he had not left the premises but was simply in areas of the premises where he was not captured on camera. *Id*. at 1248. But because there was no evidence that the employer did not honestly believe that the plaintiff had left the premises and that he had not clocked out, the Circuit upheld the district court's finding that

that the plaintiff could not establish pretext even if the employer's reason turned out to be false (*i.e.*, the employee did not actually leave the workplace). *Id.* at 1251-52. As explained by the Circuit, the court was required to look at the facts as they appeared to the decisionmaker at the time of the decision—and in *Young*, while the evidence on summary judgment may have suggested that the employer's beliefs about the plaintiff were wrong, it did not suggest that those beliefs were not honestly held. *Id.* at 1251; *accord Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1307-08 (10th Cir. 2017) (evidence that employer used poor business judgment or "got it wrong" is insufficient to establish pretext; issue is whether employer honestly believed the reasons it gave for termination and acted in good faith on those beliefs).

In sharp contrast to the facts of *Young*, the court here described at length how the record evidence was sufficient to show that Dr. Sachs did not honestly believe what he wrote in the report that led to plaintiff's termination. Specifically, the court stated that Ms. Johnson's deposition testimony, "if credited, casts doubt on whether Dr. Sachs honestly believed the substance of his report" and that additional evidence in the record was "sufficient to show that Dr. Sachs did not genuinely believe that plaintiff had infiltrated the tissue after it was excised from the patient." This case, then, does not remotely fall within the confines of *Young*. Rather, this case is a straightforward application of the well-established rule that permits a plaintiff to survive summary judgment with evidence supporting a prima facie case and discrediting the employer's proffered reason. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) ("a plaintiff's prima facie case [of discrimination], combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"). The motion is denied.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion to reconsider (doc. 79) is denied.

**IT IS SO ORDERED.**

Dated this ___22nd___ day of August, 2022, at Kansas City, Kansas.

s/ John W. Lungstrum
_____
John W. Lungstrum
United States District Judge